**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SEQUA CORPORATION, *et al.*,** | : | **Case No. 1:03cv2508** |
| | : | |
| **Plaintiffs,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | |
| **ELYRIA FOUNDRY COMPANY,** | : | **ORDER** |
| | : | |
| **Defendant.** | : | |

This matter arises on the *Motion for Summary Judgment of Defendant Elyria Foundry Company* (Doc. 25), in which Defendant seeks judgment in its favor pursuant to Federal Rule of Civil Procedure 56(c). Plaintiffs have filed an opposition brief (Doc. 32), and Defendant has replied (Doc. 34). Plaintiffs have also filed a surreply opposing the motion (Doc. 35), to which the Defendant has responded (Doc. 36).

For the reasons articulated below, Defendant's motion for summary judgment (Doc. 25) is **GRANTED in part**. For reasons outlined herein, however, this case is <u>not</u> dismissed.

I.      **FACTUAL BACKGROUND**

Plaintiff Sequa Corporation ("Sequa") is the parent company of Plaintiff Chromalloy American Corporation ("Chromalloy") (collectively "Plaintiffs" or individually "Sequa and Chromalloy"). Chromalloy is the prior owner of the Elyria Foundry, which is located in Elyria,

Ohio.  On August 1, 1983, Chromalloy sold the Elyria Foundry to Defendant Elyria Foundry Company ("EFC").  After the August 1, 1983 sale (the "1983 sale") of the Elyria Foundry to EFC, a majority of the employees who worked at the foundry prior to the sale continued to do so.  Thus, after the 1983 sale, the employees who remained employed at the foundry became "former" employees of Chromalloy and "current" employees of EFC.

Following the 1983 sale, certain former employees filed tort suits against Sequa, Chromalloy, and EFC, alleging that they were injured by exposure to silica and asbestos during their employment at the foundry (collectively "Litigation I").  Ultimately, Sequa and Chromalloy settled Litigation I.[1]  Thereafter, Plaintiffs and EFC were involved in the following litigation (collectively "Litigation II"):

(1)  *Chromalloy American Corp., et al. v. Elyria Foundry Co.,* Case No. 681121, Circuit Court of the County of St. Louis, Missouri, filed on October 4, 1995. This case involved an alleged breach of a lease agreement and asset purchase agreement by EFC.  On August 21, 1998, the court entered judgment against EFC in the amount of $3,178,296.42.

(2)  *Elyria Foundry Co. v. Sequa Corp., et al.*, Case No. 1:95-CV-2096, United States District Court, Northern District of Ohio, Eastern Division, filed on February 13, 1996.  This case involved workers' compensation claims.  On June 11, 1998, the court granted partial summary judgment in favor of Sequa and Chromalloy, finding that liability for workers' compensation premiums transferred to EFC with the 1983 sale.

(3)  *Chromalloy American Corp., et al. v. Elyria Foundry Co.*, Case No. 366024, Court of Common Pleas, Cuyahoga County, Ohio,  filed on September 24, 1998.  This case involved a foreign judgment action, in which Sequa and Chromalloy domesticated the $3,178,296.42 judgment (to Ohio) obtained in Case No. 681121 (see (1) above).

(4)  *Cheryl Foster v. Gregg Foster et al.*, Case No. D254708, Domestic Relations Court, Cuyahoga County, Ohio, filed on November 25, 1998.  Sequa and Chromalloy asserted claims against EFC, Gregg L. Foster, Madeline Townley

---

[1]  EFC was dismissed from Litigation I without contributing to the settlements.  The reason for EFC's dismissal is not clear from the parties' filings.

2

Guttman, and Cheryl Foster (estranged spouse of Gregg L. Foster) in the above captioned case in an attempt to protect their interest in the $3,178,296.42 judgment obtained in Case No. 681121 (see (1) above).[2]

On February 12, 1999, Plaintiffs and EFC (both of whom were represented by counsel) executed a *Settlement and Forbearance Agreement and Mutual Release* (the "1999 Agreement"),[3] the primary purpose of which was to resolve the various Litigation II disputes. Indeed, Section (J) of the 1999 Agreement's prefatory language states:

The Parties have determined that it is in their best interests to resolve, settle and compromise any and all disputes, claims, disagreements and differences between them and to terminate all litigation and appeals pending between them. (1999 Agreement at p. 1, Section (J) of "Recitals").[4]

---

[2]   This case involved a marital dispute in which one or more parties had asserted an interest in, or relative to, the $3,178,296.42 judgment. While it is unclear on the present record who all of the players in that case were, or what their connections to Sequa and Chromalloy were, it is clear why Sequa and Chromalloy entered that case.

[3]   In their opposition brief, Plaintiffs state that the 1999 Agreement was entered into on February 12, 1999. (Doc. 32, at p. 4). In its motion for summary judgment, EFC states generally that the 1999 Agreement was entered into in "February 1999." (Doc. 25, at p. 2). The 1999 Agreement itself does not provide an "effective" date.

The parties signed the 1999 Agreement, however, on different dates in February of 1999, including: February 11th, 12th, and either the 15th or 19th (the date is not legible). Given these circumstances, and because EFC does not challenge the February 12, 1999 execution date proposed by Plaintiffs, the Court deems the "effective date" of the 1999 Agreement to be February 12, 1999. This distinction has no material effect on the Court's analysis.

[4]   The 1999 Agreement was entered into by the following parties: Sequa, Chromalloy, E.F. Company, EFC, Gregg L. Foster, and Madeline Townley Guttman. Thus, when the 1999 Agreement refers to "the Parties," it is referring to all of the aforementioned entities and individuals.

3

In Paragraph (4) of the operative portion of the 1999 Agreement,[5] EFC agreed to pay Plaintiffs $1,600,000.00 "in full and complete satisfaction of the [$3,178,296.42 judgment amount Plaintiffs had previously obtained in Case No. 691121 against EFC] and any and all other amounts allegedly owed [Plaintiffs] in [Litigation II]." (1999 Agreement at p. 5, Paragraph (4)).  In exchange, Plaintiffs agreed <u>to release</u> EFC from "any and all manner of actions, causes of action . . . arising out of or connected to acts and/or omissions prior to the effective date of [the] release, including, **but not limited to**, those claims . . . which in any way . . . are based upon . . . [Litigation II] . . . ." (1999 Agreement at p. 8, Paragraph (10) (emphasis added)).  In its entirety, Paragraph (10) provides:

> 10.  Effective upon timely delivery of Final Payment to Chromalloy (or waiver of its timeliness by Chromalloy), **Chromalloy**, on behalf of itself and its affiliate companies, subsidiaries, parent companies, directors, officers, shareholders, employees, agents, representatives, insurers, attorneys, predecessors, successors and assigns, **fully releases and forever discharges Elyria Foundry** and its affiliate companies, subsidiaries, parent companies, directors, officers, shareholders, employees, agents, representatives, insurers, attorneys, predecessors, successors and assigns, and Gregg L. Foster, Cheryl Foster and Madeline Townley Guttman, and each of their respective heirs, personal representatives, successors and assigns, of and from **any and all manner of actions, causes of action**, claims for attorneys' fees, **suits**, debts due, sums of money, royalties, accounts, covenants, contracts, **controversies, damages, claims**, demands, orders, awards, judgments, payments, costs and **obligations of whatsoever nature, direct or indirect, known or unknown, matured or not matured, in law and in equity, now or hereafter discovered, which it now has, claims to have, has had, or may hereafter have**, arising out of or connected to acts and/or omissions prior to the effective date of this release, **including, but not limited to**, those claims, causes of action, and liabilities which in any way arise out of, or are based upon, related to, or in connection with the Actions and/or any causes of action for relief (including, without limitation, claims and/or causes of action asserted in the Domestic Relations Action against Gregg L. Foster, Cheryl Foster and Madeline Townley Guttman) which were or could have been asserted in the Actions, save and except the provisions of paragraph 11 of this

---

[5]  The operative portions of the 1999 Agreement include the "NOW THEREFORE" clause and Paragraphs (1) - (21).

4

Agreement and the provisions regarding the release of Chromalloy in the judgment entry in the Domestic Relations Actions. (1999 Agreement at p. 8-9, Paragraph (10) (emphasis added)).

As in Litigation I, in late 2000 and continuing through 2002, a number of foundry employees (who worked at the foundry both <u>before and after</u> the 1983 sale) and their spouses filed personal injury and/or wrongful death suits against Sequa, Chromalloy, and EFC (collectively "Litigation III").[6] Like the Litigation I plaintiffs, the Litigation III plaintiffs sought damages for alleged injuries in connection with exposure to silica, silica dust, asbestos and asbestos dust during their employment at the Elyria Foundry. As before, and with no contribution to the settlements that followed, EFC was voluntarily dismissed without prejudice from Litigation III. To date, Plaintiffs have expended approximately $550,000.00 settling Litigation III.

## II.  <u>PROCEDURAL HISTORY</u>

On December 9, 2003, Plaintiffs filed  their Complaint seeking: (1) statutory contribution (*see* Ohio Rev. Code §§ 2307.25, 2307.26, and/or 2307.31); and (2) common law indemnification for EFC's proportionate share of the Litigation III settlements.[7] Specifically, Plaintiffs allege that

---

[6]     Litigation III includes the following lawsuits:

(1)     *Matthew Abrogast, et al. v. Elyria Foundry Company, et al.*, Case No. 02-cv-131409;

(2)     *Chris Williams, et al. v. Elyria Foundry Company, et al.*, Case No. 00-cv-127534;

(3)     *William Bonds, et al. v. Chromalloy American Corp., et al.*, Case No. 01-cv-129307;

(4)     *Freeman Morris, et al. v. Chromalloy American Corp., et al.*, Case No. 01-cv-128680; and

(5)     *Janice Mathis, et al. v. Elyria Foundry Co., et al.*, Case No. 00-cv-129306.

[7]     Although Plaintiffs assert both contribution <u>and</u> indemnification in their Complaint, they indicate in their opposition brief that the claims are alternative to

5

they have "paid an aggregate total in excess of five hundred fifty thousand dollars ($550,000.00) to settle [Litigation III]," and that "[EFC] contributed to the harm alleged in [Litigation III] because the [Foundry Employees] . . . worked at the Elyria Foundry after it was sold to [EFC] on August 1, 1983 and were [thus] exposed to silica, silica dust, asbestos dust and/or other substances while working for [EFC]." (Doc. 1 at p. 2). Plaintiffs allege, therefore, that EFC should be ordered proportionately to contribute (or to indemnify Plaintiffs) to the Litigation III settlements, which have been funded solely by Plaintiffs.

After answering, EFC filed the instant motion for summary judgment arguing that Plaintiff can seek neither contribution nor indemnity from EFC as a matter of law. Plaintiffs opposed the motion and EFC replied. Plaintiffs also filed a surreply, which EFC opposed. The Court now resolves Defendant's motion for summary judgment.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and, in pertinent part, states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Specifying the materials properly submitted in connection with a motion for summary judgment, Rule 56(e) states:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent

---

one another, though it is not clear which is the primary claim.

6

> to testify to the matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The moving party is not, however, required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970); *see also Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 217 (6th Cir. 1992).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id.* at 252.  If, however, the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

7

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some "metaphysical doubt as to material facts." *Id.*

## IV.  THE PARTIES' ARGUMENTS

EFC presents three arguments in support of its motion. Principally, EFC argues that the Release in the 1999 Agreement <u>unambiguously</u> bars Plaintiffs' claims – at least in part – because it releases any and all known and unknown claims including, <u>but not limited to</u>, those relating to the claims at issue in Litigation III.[8]

In an effort to invalidate the Release, thereby mooting EFC's principle argument, Plaintiffs

---

[8]     Even assuming the Release is enforceable as written, EFC does not address whether the present Plaintiffs potentially could recover contribution for portions of the underlying settlement(s) (if any) that arguably relate to alleged injuries incurred <u>after</u> the 1999 Agreement was executed – *i.e.*, after February 1999. The Court addresses this potential issue *infra*.

8

assert a mutual mistake of fact defense.[9] They argue that even an unambiguous anticipatory release fails when the parties thereto were not "aware" of (or had not contemplated) specific causes of action filed after the release's execution – *i.e.*, in this case, the underlying Litigation III tort claims. Asserting that the underlying tort claims were "unknown" in 1999, Plaintiffs argue that it was not their intent – nor anyone's intent – to release any liability in connection with those claims, despite specific reference to "unknown" claims in the Release. As support, Plaintiffs submit Steven Lowson's (Sequa's Senior Associate General Counsel) affidavit, wherein Lowson avers that, at the time the 1999 Agreement was executed, none of the underlying tort claims had been filed and there was no discussion between Plaintiffs and EFC that they intended the anticipatory release provision of the 1999 Agreement to include such claims. In so far as the parties' intent informs the scope of a release, Plaintiffs argue that summary judgment is inappropriate because "intent" is now at issue and a "genuine issue of material fact" has been raised. Plaintiffs have not, however, sought rescission of the 1999 Agreement (or even offered to tender back the $1.6 million they received), which EFC argues is a prerequisite to a party's request to cancel a release.

Alternatively, EFC individually addresses Plaintiffs' indemnification and contribution claims. It argues that Plaintiffs' indemnification claim fails because Ohio law does not permit indemnification between alleged <u>joint</u> tortfeasors. Because no contractual or employment relationship exists (or existed) between EFC and Plaintiffs, EFC argues that indemnification is not a cognizable claim here because, at best, Plaintiffs and EFC were alleged joint tortfeasors in

---

[9]      In asserting the mutual mistake of fact defense, Plaintiffs do not argue that the entire 1999 Agreement is void, which usually results from a successful assertion of that defense. Indeed, Plaintiffs do not seek to rescind the 1999 Agreement, nor have they sought leave to amend the Complaint to assert such a claim.

connection with the underlying tort plaintiffs' claims.

In response, Plaintiffs argue that EFC can be liable because it is a <u>concurrent</u> tortfeasor, as opposed to a "joint" tortfeasor.  Plaintiffs argue that, as a <u>concurrent</u> tortfeasor, EFC is subject to indemnification under the doctrine of "last injurious exposure," which applies in situations where an employee is injured in the scope of his or her employment and only the last employer who exposed the employee to the hazard is liable.

As to the contribution claim, EFC argues that it fails – at least in part – because, pursuant to Ohio Rev. Code § 2307.25(B), EFC cannot be forced to contribute to settlements of claims from which it has not been released.  In this regard, EFC explains that certain of the underlying tort plaintiffs who settled their claims in Litigation III – *i.e.*, Chris Williams, Thomas Partlow, William Hill and their respective spouses (collectively the "Williams Group") – <u>did not release EFC</u> when they settled with the Plaintiffs, even though they did not pursue claims against EFC at that time.

Plaintiffs argue in response that, because EFC has assumed "joint tortfeasor" status in responding to the indemnification claim, it cannot <u>completely</u> avoid contribution as a matter of law. This argument is irrelevant, however, because EFC <u>does not argue</u> that contribution is <u>wholly</u> inapplicable.  EFC only argues that it is inapplicable in connection with the Williams Group, the members of which did not release EFC when they settled their tort claims with the Plaintiffs. Ultimately, Plaintiffs concede that their contribution claim must exclude amounts paid to tort plaintiffs who have not released EFC – *i.e.*, the Williams Group.

## V.  **DISCUSSION**

The Court concludes that the Release is valid and bars,[10] at least in part, Plaintiffs from pursuing their contribution and indemnity claims against EFC.[11]  The Plaintiffs' principle argument in opposition to the Release fails because they have neither:  (1) sought rescission of the Release; nor (2) demonstrated any attempt to return the $1.6 million they received as consideration for the 1999 Agreement (and the Release).  *See Stone v. City of Rocky River, et al.,* No. 49434, 1985 WL 8539, at *2-3 (Ohio Ct. App. 8th Dist. Oct. 31, 1985).  As noted in *Axx v. Schirg*, 1976 WL 188344 at *2 (Ohio App. 6th 1976), a plaintiff's failure to return the consideration he received in exchange for signing a release, on its own, renders a mutual mistake of fact defense inapplicable.[12]  Though raised by EFC throughout its briefs, Plaintiffs completely ignore this fundamental requirement in their attempt to reap the benefit of the 1999 Agreement, while avoiding its admittedly broad release language.  This simple, and unopposed, basis alone justifies granting EFC's motion.

Notwithstanding the foregoing, Plaintiffs' argument that the Release is invalid because it was

---

[10]     Appropriately, the Plaintiffs do not dispute that the terms of the Release – as a matter of interpretation – capture the tort claims giving rise to the present case. Clearly, the terms of the Release are extremely broad.  As to the Release, the only issue that remains, therefore, relates to its enforceability.

[11]     Though the Plaintiffs do not point out this distinction, because a portion of the underlying tort settlement(s) arguably could relate to alleged injuries that post-date February 12, 1999 (*i.e.*, the execution date of the 1999 Agreement), the Release does not necessarily bar the Plaintiffs' claims in their entirety.  The Court further addresses this issue *infra*.

[12]     In *Axx*, because the plaintiff did not return the compensation he received for the release, the court refused to apply *Sloan v. Standard Oil Co.,* 203 N.E.2d 237 (Ohio 1964).  For the same reason, as noted above, the Plaintiffs' reliance on *Sloan* in this case – despite other points of distinction – is fundamentally misplaced.

11

based on a mutual mistake of fact fails on other grounds and warrants discussion.

    **A.**    **Despite Plaintiffs' Failure To Return The $1.6 Million, The Release Is Enforceable.**

Generally speaking, validly executed releases are enforceable.  "A release of a cause of action is ordinarily an absolute bar to a later action on any claim encompassed within the release."  *Haller v. Borror Corp.*, 552 N.E.2d 207, 210 (Ohio 1990).  In the present case, Plaintiffs <u>unambiguously</u> (and broadly) released EFC from

> any and all manner of actions, causes of action . . . [whether] known or unknown, matured or not matured, in law and in equity, now or hereafter discovered, which it now has, claims to have, or has had, or may hereafter have arising out of or connected to acts and/or omissions prior to the effective date of [the] release, including, **but not limited to**, those claims . . . which in any way . . . are based upon . . . [Litigation II] . . . .

1999 Agreement at p. 8, Paragraph (10) (emphasis added).  Plaintiffs do not dispute that the 1999 Agreement was entered into knowingly and voluntarily; nor do they dispute that the 1999 Agreement is unambiguous and captures, if enforceable, their present claims.

In *Task v. National City Bank, et al.,* No. 65617, 1994 WL 43883, at *4 (Ohio Ct. App. 8th Dist. Feb. 10, 1994), an Ohio appellate court explained:

> A release ordinarily operates to extinguish a right in exchange for some consideration and effectively operates as an estoppel or a defense to an action by the releasor.  As such, it is a contract between parties, enforceable at law subject to the rules governing the construction of contracts.  <u>Whether a release operates upon a certain liability depends entirely upon the intention of the parties, which is to be gathered from the language of the release and the state of facts then existing.  If the parties to a release intend to leave some things out of a release, then "their intent to do so should be made manifest.</u>"  When the terms of a contract are unambiguous, courts will not, in effect, create a new contract by finding an intent not expressed in the language employed by the parties.  Moreover, when the parties have negotiated the release with the assistance of legal counsel, and both sides have agreed to the language included in the release, there is an assumption that the parties are fully

12

aware of the terms and scope of their agreement.

*Id*. (internal citations omitted, emphasis added).  It is true, however, that the doctrine of mutual mistake, under appropriate circumstances, allows parties to escape the unambiguous limitations of a broad release.  To that end, the doctrine permits <u>rescission</u> of a release in certain situations.  *See generally Reilly v. Richards*, 632 N.E.2d 507, 508 (Ohio 1994); *see also Sloan v. Standard Oil Co.,* 203 N.E.2d 237 (Ohio 1964).  A "material mutual mistake" is a mistake made by <u>both parties</u> at the time a contract is made, as to a basic assumption on which the contract is made, which has a <u>material effect</u> on the agreed exchange of performances.  *Reilly*, 662 N.E.2d at 509 (citing 1 Restatement of the Law 2d, Contracts (1981) 385, Mistake, Section 152(1)).

In support of their view that the mutual mistake doctrine applies in this case – permitting Plaintiffs completely to evade the Release's broad limitations –  Plaintiffs rely heavily on *Sloan v. Standard Oil Co.,* 203 N.E.2d 237 (Ohio 1964).  In sum, the Supreme Court of Ohio held in *Sloan* that a release can be invalidated if a party can establish by clear and convincing evidence that both parties operated under a material mistake of fact at the time they executed their release, such that the language of the release did not reflect their intent.  Plaintiffs also rely on *AM International Inc. v. International Forging Equipment Corp.*, *et al.,* 982 F.2d 989 (6th Cir. 1993).  In turn, the Court addresses these cases below but concludes that neither renders the Release unenforceable.[13]

*Sloan's* applicability is not nearly as broad as Plaintiffs argue.  Indeed, Plaintiffs' view of

---

[13]     As noted *supra*, Plaintiffs' attempt to invalidate the Release fails in the first instance because they have not tendered back the money they received and sought rescission of the 1999 Agreement.  Though the Court finds *Sloan* distinguishable for other reasons as well, the Court notes that *Sloan* was an action <u>to cancel</u> the Release at issue in that case.  In so far as Plaintiffs have not sought rescission, *Sloan* is distinguishable on this basis as well.

*Sloan* effectively prevents a party from ever invoking a release to bar claims as a matter of law because any party, at any time, without returning the consideration received in exchange for a release, would be able to claim that the party's original intent with regard to the scope of a release is different from the intent expressed by the release's language (upon which the parties agreed).  As they do here, Plaintiffs further suggest that an assertion of a lack of intention to release a given claim places intent in issue and "creates" an issue of fact, thereby always rendering summary judgment unavailable to a defendant attempting to invoke a broad anticipatory release.

Clearly, such an expansive – and unreasonable – application of the mutual mistake doctrine was not *Sloan's* intent, and it cannot be the law.  If it were, one would have expected the Supreme Court of Ohio simply to have invalidated all anticipatory releases, or to hold that references to "unknown" claims are to no effect; it did not go that far.  Even when applied narrowly, however, *Sloan* presents an exception that, if not carefully policed, could easily swallow the general rule that broad releases are enforceable.  For this reason, the Court first considers *Sloan* and its progeny to attempt to determine *Sloan's* scope.  It appears that an argument can be made that *Sloan* espouses a rule which is only applicable in the narrow factual circumstance at issue there - *i.e.*, that it was not intended to be applied in the context of commercial disputes like this one.

*Sloan* involved a plaintiff's claim for personal injuries sustained in an automobile accident. 203 N.E.2d 237 (1964).  When the accident occurred, the "at-fault" driver assured the plaintiff that he would pay for any damage to the plaintiff's vehicle and directed the plaintiff to send a bill for any repairs that were needed.[14]  *Id.*  Other than a headache and a stiff neck, the plaintiff manifested no

---

[14]     The "at-fault" driver in *Sloan* was an employee of the Standard Oil Company and was working within the scope of his employment when the accident occurred.

physical injuries at the time of the accident.  *Id*.  Plaintiff repaired his vehicle at a cost of $20.19, which the defendant reimbursed in exchange for a general release of any possible liability arising from the accident.  *Id*.  No counsel and no protracted negotiations were involved in the transaction. Approximately six months later, the plaintiff "felt a tingling sensation in the fingers of his left hand." *Id*. at 240.  Following months of discomfort, he underwent surgery for a ruptured cervical disc and later sought compensation for his personal injuries.  *Id*.

The plaintiff in *Sloan* sought to cancel the release he had signed because, despite its broad language, he asserted that the parties had not intended to release liability for personal injuries.  *Id*. He asserted that the release, though governing "unknown" claims, was a release of property damage and not personal injury claims.  Thus, while he conceded that "unknown" damages to his vehicle could not be recovered, he argued that the release simply could not be read to encompass claims relating to his personal injuries.  There was little dispute as to what the parties knew and contemplated at the time they executed the release in *Sloan* - *i.e.*, both parties conceded that the focus of their agreement was on the property damage to the plaintiff's car.  The trial court concluded that the release, which was the entirety of the agreement between the parties, was premised upon a mutual mistake of fact.  It found, therefore, that the release did not bar the plaintiff from pursuing claims for his physical injuries.  *Id*.

Observing at the outset that it "has had little occasion to consider the legal principles applicable to releases for personal injuries," the Supreme Court of Ohio upheld the trial court's cancellation of the release.  *Id*. at 239 (emphasis added).  It then articulated a test and a variety of factors for determining whether a release should be set aside due to a mutual mistake of fact underlying its execution.  *Sloan's* syllabus states:

15

1.    A release may be avoided where the releasor can establish by clear and convincing evidence that it was executed by mutual mistake, as between himself and the releasee, of a past or present fact material to the release, as where there was a mutual mistake as to the existence of any injury of the releasor, unless it appears further that the parties intended that claims for all injuries, whether known or unknown at the time of the execution of the release, be relinquished.

2.    Whether the parties to a release actually intended to discharge all liability is a question of fact for the trier of the facts.

3.    The terms of a release cannot circumvent the powers of equity to correct mistakes.

*Id.* at 238 (citation omitted).  Stated favorably to the party seeking rescission, the Court established factors to consider in determining intent:

1.    The absence of bargaining and negotiating leading to settlement;
2.    The releasee is clearly liable;
3.    The absence of discussion concerning the type of injuries suffered;
4.    The contention that the injuries were in fact unknown at the time the release was executed is reasonable;
5.    An inadequate amount of consideration received compared with the risk of the existence of unknown injuries;
6.    Haste by the releasee in securing the release; and
7.    The terms of the release exclude the injuries alleged.

*Id.* at 240.

While *Sloan* remains good law, and certainly has been relied upon by many courts over the years, the circumstances of this case are so fundamentally different from those in *Sloan* and its progeny it is unclear whether *Sloan* is even implicated by the Release over which the Plaintiffs and EFC are now arguing.  *Sloan's* principle distinction is that it involved a plaintiff who affirmatively sought <u>rescission</u> of the release he signed.  Plaintiffs here, however, have neither sought rescission, nor even responded to EFC's argument that rescission is <u>required</u> when a mutual mistake of fact

16

defense is asserted.  For that reason alone, *Sloan* cannot operate to invalidate the Release in this case.

Admittedly, however, that distinction does not resolve the question of whether *Sloan* would apply

<u>if</u> the Plaintiffs had sought rescission and tendered back the $1.6 million.

As suggested by the Court's opening – and seemingly <u>qualifying</u> – comment, *Sloan* was

directed toward personal injury cases, or at least toward cases where <u>the release at issue represents</u>

<u>the entire agreement between the parties</u>.[15]  The *Sloan* court stated:

> Research indicates that this court has had little occasion to consider the legal
> principles applicable to releases <u>for personal injuries</u>, despite the fact that an
> overwhelming number of sister states have been so concerned.  It is the opinion of
> this court that an analysis of this area of the law is needed in Ohio."

*Id*. at 239 (emphasis added).  Indeed, seemingly every Ohio case applying *Sloan* is an <u>automobile</u>

<u>personal injury</u> case with facts substantially identical to those in *Sloan*, including the fact that the

releases at issue in those cases were the entire contracts between the parties.  Given the Supreme

Court of Ohio's qualifying language, and the manner in which *Sloan* has been applied by the Ohio

Courts over the past four decades, therefore, it is reasonable to conclude that *Sloan's* rule is limited

to the facts presented there.  Based on its examination of Ohio law, if writing on a clean slate, this

Court would conclude that *Sloan* does not apply in the context of commercial disputes, and that

anticipatory releases of "unknown" claims are enforceable in the commercial context absent fraud

in the inducement or some other traditional equitable bar to the agreement.  Thus, the Court would

---

[15]     The Court suspects that *Sloan*, at least in part, was responsive to the fact that
unrepresented auto-accident victims were being encouraged by insurance
companies quickly to resolve accident claims.  In so far as such agreements often
occur quickly and without much "negotiation", it is understandable that a court
may be skeptical regarding the extent to which the terms of a given release reflect
the parties' actual intent at the time of execution or even whether it would be fair
to invoke the terms of such a hastily established agreement.

17

conclude that, where a release is executed in conjunction with a fully-negotiated commercial agreement between parties represented by counsel, and the release is <u>not</u> invoked to bar recovery for personal injuries to the releasor by the releasee, the rule of *Sloan* may not be invoked in an attempt to avoid an express argument to release "unknown" and "immature" claims.

As with most legal issues, however, this Court is not writing on an entirely clean slate.  As noted above, in addition to *Sloan* itself, Plaintiffs invoke the Sixth Circuit's decision in *AM International*, 982 F.2d 989 (6th Cir. 1993) (hereinafter "*AMI*"), in support of their claim that the Release should not operate to bar unknown claims, despite unambiguous language saying that it does.  There, the Sixth Circuit apparently read *Sloan* broadly and concluded that, depending on the factual circumstances at issue, the *Sloan* rule could be invoked by parties to commercial disputes in an effort to avoid an anticipatory release.  There, the Sixth Circuit held:

> [u]nder Ohio case law, even where a release contains unambiguous language that purports to bar claims based on unknown future causes, the release will not be effective where evidence clearly indicates that, at the time they signed the release, the parties had neither foreseen nor considered the specific cause which later gave rise to the claim.

*Id*. at 997.  The Sixth Circuit thereafter remanded the case to the district court for a consideration of the *Sloan* criteria and a determination of whether "the evidence clearly and convincingly establishes that the parties did not intend the release to cover [the] liability [at issue there]."  *Id*.

Because this Court is bound by Sixth Circuit precedent, even on its interpretation of Ohio law, it must assume that *Sloan* does apply to commercial disputes.[16]  This Court must then – as the

---

[16]     Conceivably, this Court could conclude that since, in the fifteen years since *AMI*, the Ohio Courts have neither cited *AMI* as grounds for expanding *Sloan* into the commercial dispute context nor done so on their own, it is now clear that Ohio law is not as the *AMI* court described it.  Given the unambiguous holding of *AMI*

district court was directed to do in *AMI* – apply the *Sloan* criteria to determine whether, as Plaintiffs

contend, *Sloan* prevents this Court from entering judgment for Defendant as a matter of law on the

basis of the Release.  Ultimately, the Court concludes that it does not.  Before turning to the *Sloan*

criteria, and to the question of whether Plaintiffs have raised a material issue of fact in respect to

their proper application here, however, the Court briefly turns to the facts of *AMI* and concludes that

they are materially distinguishable from those at issue here.

    *AMI* primarily involved substantive environmental issues under the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").  Pursuant to

CERCLA, AM International, Inc. ("AMI") filed an action to recover costs it incurred in removing

environmentally hazardous substances from a site it had previously occupied.  In light of a prior

settlement and release, the trial court barred all of AMI's claims except its CERCLA claim.[17]  AMI

later succeeded on that claim and was awarded compensation (*i.e.*, reimbursement) for its costs.  On

appeal, the defendants argued:  (1) that CERCLA does not render the release unenforceable; and (2)

neither did Ohio law.  Obviously, only the latter of these two issues is relevant here.

    In sum, the facts of *AMI* are these.  Following the sale of a piece of property to the

defendants, AMI leased back a portion of a building on the property to engage in manufacturing

activities.  The area AMI leased contained all the equipment necessary for AMI's manufacturing

---

    however, and the deference this Court must give to the holdings of the Sixth
Circuit, this Court does not feel free to do anything other than adhere to *AMI* as
written.

[17]    In sum, the trial court concluded that CERCLA does not allow parties to allocate
costs for environmental clean up – *i.e.*, it rendered the release unenforceable as to
AMI's CERCLA claim.

19

operations, which consisted of the manufacture of component parts for offset duplicating machines. As the expiration date of its lease approached, AMI announced that it would cease operations at the facility. Initially, the defendants considered taking over AMI's manufacturing business. When that plan foundered, the defendants elected instead to purchase AMI's assets on an "as is, where is" basis. Subsequent to – and in connection with that asset purchase – a number of disputes arose between AMI and the defendants, which resulted in litigation. Ultimately, they settled their disputes and AMI received $2.3 million in exchange for, among other things, a general release.

Following its cessation of operations at the facility, and following the execution of the general release, AMI's plant engineer and a clean-up crew stayed behind to dispose of industrial wastes and generally to clean up (and close down) the facility. For example, electroplating baths, salt pots and the wastewater treatment plant, all of which were used in AMI's manufacturing operations, were left behind with the appropriate substances and solutions in them so that the equipment was prepared for an immediate start-up of the facility by a new owner. Thereafter, the defendants sold off all of the portable components of the equipment purchased from AMI.

About a year later, a water main break destroyed the building's sprinkler system, damaging the building's boiler. Neither the sprinkler nor the boiler was ever repaired, and heat was never restored to the facility. One or two years later, a section of the building's roof collapsed and, likewise, was not repaired. As a result, rain and snow fell into the building and each succeeding winter led to freezing and thawing.

The next year, following a citation from the local fire prevention bureau and an order from the local building commissioner that the facility be vacated, an official from the Ohio Environmental Protection Agency ("OEPA") visited the facility and discovered drums and other containers filled

20

with flammable or toxic substances.  Having determined that the on-site chemicals were "hazardous waste" and problematic due to the building's state of disrepair, the official ordered the defendants (*i.e.*, the owners) to hire a hazardous waste removal contractor to prepare and carry out a remediation plan approved by OEPA. The defendants refused, however, arguing that AMI was responsible for the substances.  OEPA later contacted AMI and AMI agreed to perform the cleanup.  After the OEPA approved AMI's clean-up efforts, AMI made a demand upon the defendants for reimbursement of the cost of the cleanup. When the defendants refused, AMI filed an action for, among other things, reimbursement under CERCLA.[18]  Not surprisingly, the defendants asserted the release they and AMI had executed.

After concluding that, under *Sloan*, Ohio law <u>might</u> allow a court to disregard the release at issue there, the Court emphasized that the unique circumstances before it – *i.e.*, where "the events causing the harm upon which liability is predicated had not occurred at the time of the signing of the release"– were important to its decision to remand the case to the district court. *AMI*,  982 F.2d  at 997.

This case is nothing like *AMI*.  Defendant does not invoke the Release to bar claims arising from liability-producing conduct that post-dates its execution.  The release in this case, unlike the release in AMI, only seeks to bar "unknown" claims which "arise out of or [are] connected to acts and/or omissions <u>prior</u> to the effective date of the release."  (Emphasis added).  Thus, Defendant does not, and cannot, seek to bar claims based on conduct *vis-a-vis* complaining employees (*i.e.*, exposure) which occurred <u>after</u> the Release was executed.  Instead, the parties expressly decided to

---

[18]    In sum, CERCLA provides a statutory reimbursement remedy to a party who incurs costs for environmental clean up efforts caused by another party.

end all disputes between them which pre-dated the Release (and there were many) and expressly included within their agreement a release of even unknown and immature claims which might arise out of their respective earlier acts and omissions.

In this case, moreover, the parties were specifically aware that, as of the date of the Release, foundry employees already had alleged injury due to exposure to particulate inhalation.  That is what Litigation I was all about.  Plaintiffs do not contend that they were blind-sided by Litigation III; indeed, given the nature of asbestos litigation, they cannot claim complete surprise.  All Plaintiffs assert is that the particular claims asserted in Litigation III had not yet been filed.[19]  Where, as here, sophisticated parties have information that would have put reasonable persons on notice that potential claims exist, they must be bound by a decision to release "unknown" claims and may not invoke the rule of *Sloan* to avoid that decision.  Indeed, that is what the Sixth Circuit held in the only other case to address *Sloan* in a commercial context.

In *Osgood v. Florence Leasing Co., LTD., et al.,* 1993 WL 172877, at *2 (6th Cir. May 21,1993), though an unpublished decision, the Court refused to allow investors to invoke *Sloan* to avoid the terms of their loan agreements because it found that they had "ample information to determine that [the defendant] might [have been] involved in fraudulent conduct."  The Sixth Circuit concluded that the plaintiff-investors could not claim mutual mistake of fact simply because they were "unaware" of the particulars of that alleged conduct.  *Id*.  As such, the Court rejected the plaintiffs' view that they had not intended to release the defendant-bank from future fraud-based

---

[19]     Interestingly, Plaintiffs do not even go so far as to claim there was no threat of future litigation when the Release was executed, only that the actual litigation had not yet been filed.

22

claims and found that they were bound by their express agreement to do so.

Assuming, by virtue of *AMI* and *Osgood*, that *Sloan* is available in certain circumstances involving commercial agreements, the Court turns to the *Sloan* factors to determine if, unlike in *Osgood*, those circumstances are present here, or are at least present to a degree which prohibits judgment as a matter of law in Defendant's favor.  The Court concludes they are not.

Keeping in mind the parties' respective burdens – *i.e.*, that at trial Plaintiff would need to establish a *Sloan*-type mutual mistake by clear and convincing evidence – the Court examines the evidence presented in support of and opposition to Defendant's Motion for Summary Judgement.[20] On one hand, Steven Lowson, on behalf of the Plaintiffs, avers:

> . . . At the time the 1999 Settlement Agreement was being negotiated . . . none of the intentional tort claims relevant to this action had been made . . . There were no discussions concerning potential employee tort claims during the settlement negotiations . . . Further, there was no discussion between the parties that it was the intent of the parties to include any potential employee tort claims in the anticipatory release provisions of the settlement agreement . . . It was the understanding and intent of Sequa that the 1999 Settlement Agreement, including the anticipatory release of claims, related only to the Contract Claims and the release of any further potentially related contract claims in the future, whether known or unknown at the time of the settlement . . .

*See* Doc. 32-2.  And on the other hand, Samuel Knezevic, on behalf of EFC, avers:

> . . . During the negotiations, the parties expressly discussed that there would likely be future claims that were unknown, not matured or yet to be discovered at the time the Settlement and Forbearance Agreement was entered that were to be part of the Settlement and Forbearance Agreement . . . Based on the clear and unambiguous language of the Settlement and Forbearance Agreement and the express discussions during negotiations to release any and all claims, whether known or unknown, [EFC] believed that all future claims had been released . . . Sequa has not tendered its $1.6 million consideration back to Sequa [sic –

---

[20]     There are just two affidavits.  They are from: <u>Steven Lowson</u> (Sequa's Vice-President and Senior Associate General Counsel) (Doc. 32-2) (referred to as "Plaintiffs' affidavit"); and <u>Samuel Knezevic</u> (EFC's Executive Vice-President and General Counsel) (Doc. 36-2) (referred to as EFC's affidavit).

23

should be EFC] in order to avoid the Settlement and Forbearance Agreement based on mutual mistake . . .

*See* Doc. 36-2.

As outlined above, *Sloan* identified a series of factors for courts to consider in determining parties' intent.  Those factors are:

1.  The absence of bargaining and negotiating leading to settlement;
2.  The releasee is clearly liable;
3.  The absence of discussion concerning the type of injuries suffered;
4.  The contention that the injuries were in fact unknown at the time the release was executed is reasonable;
5.  An inadequate amount of consideration received compared with the risk of the existence of unknown injuries;
6.  Haste by the releasee in securing the release; and
7.  The terms of the release exclude the injuries alleged.[21]

Unlike the parties in *Sloan*, the Plaintiffs and EFC are sophisticated business entities who were represented by counsel when the 1999 Agreement was negotiated and executed – certainly, the affidavits agree that the 1999 Agreement was the product of negotiation and bargaining.  As such, if leniency accompanied the court's consideration of the plaintiff's unaided resolution of his auto-accident claim in *Sloan*, it does not follow that such leniency is appropriate here.  Likewise, Plaintiffs have presented no evidence that the 1999 Agreement's negotiations were rushed or insufficient.  Rather, the affidavits and the detailed nature of the agreement itself all indicate that the negotiations were substantial.  Accordingly, factors 1 and 6 do not even arguably support invalidating the Release.

Factor 2 also does not support invalidation of the release.  In *Sloan*, this factor was critical

---

[21]  In so far as the parties do not dispute that the terms of the Release, if enforceable, capture the Plaintiffs' claims, the Court need not address this factor.

24

because there was no dispute but that the releasee in that case had caused direct personal injury to the plaintiff.  Here, there has never been a determination that EFC is liable to either Plaintiffs or the underlying tort claimants in connection with the claims asserted in Litigation III.  Indeed, EFC was dismissed and released from all claims in both Litigation I and Litigation III.

Factors 3 and 4, taken together, also do not support Plaintiffs' extraordinary request. Plaintiffs argue that, because "potential employee tort claims" were not mentioned specifically during the parties' negotiations, the parties could not have intended for the Release to capture such claims.  Further, they argue that, because such claims were only "potential" claims (*i.e.*, they had not yet been filed), they were "unknown" and <u>could not</u> have been contemplated by the parties.  EFC, on the other hand, argues that the parties expressly discussed that future known and unknown claims likely would arise – thus, though unidentifiable specifically, they were contemplated – and that the parties, therefore, intended to release such claims by agreeing on broad release language.  Most notably, the Release states that the known and unknown claims it releases included, "but [are] not limited to," the disputes giving rise to the 1999 settlement.

Plaintiffs' view on these issues is simply unpersuasive.  To argue that the employee tort claims were "unknown" in the sense that they were wholly unforeseeable is a stretch, especially in light of Litigation I.  Though they may not have been discussed specifically, Plaintiffs' contention that the underlying tort claims were "unknown" – and, therefore, could not have been contemplated – simply because they had not yet been filed, is unreasonable under the circumstances.  Unlike the events giving rise to the injury in *AMI*, for example, the events giving rise to the alleged underlying tort injuries the employee-plaintiffs would bring had already occurred by the time the Release was executed, and unlike the circumstances in *Sloan*, the parties here cannot claim that they simply never

25

contemplated the possibility of the claims in Litigation III, given their substantial similarity to those resolved in Litigation I. Thus, factors 3 and 4 do not support invalidating the Release.

As for factor 5, and whether it is reasonable to conclude that the $1.6 million bought an "all-inclusive" release <u>in addition to</u> inducing Sequa to foregoing enforcement of a $3.2 million judgment it had against EFC,  Plaintiffs suggest that, because the $1.6 million settlement is exactly one-half of the judgment Sequa was attempting to collect, the Release must pertain only to the underlying contract disputes.  Unlike the minimal settlement figure in *Sloan*, which was wholly attributable to the plaintiff's property damage and easily recoverable from the admitted tortfeasor, there was <u>substantial</u> debate over Sequa's right to collect the entirety of the $3.2 million judgment.  There were a number of disputes between the parties other than the $3.2 million judgment, and they were all encompassed within the 1999 Agreement.  Those disputes clearly prompted a compromise payment figure reflecting EFC's claimed set-offs.  Ultimately, the Court cannot say that the size of the settlement – which is on its face substantial – alone justifies even questioning, much less invalidating, the release accompanying it.

For these reasons, the Court concludes that, even under a strict application of *Sloan*, Plaintiffs have failed to raise a material issue of fact barring enforcement of the Release.

**B.  Contribution and Indemnification.**

Because the Release is enforceable, and thus, bars most of Plaintiffs' claims, the issues relating to contribution and indemnification largely are moot.  As outlined above, however, the Release bars only the portions of Plaintiffs' claims that relate to pre-February 12, 1999 (the 1999 Agreement's execution date) acts or omission.  Based on the present record, it is unclear whether a definable portion of the settlement funds for which Plaintiffs seek proportionate reimbursement

26

arguably relate to alleged injuries that post-date February 12, 1999.  The Court cannot determine, therefore, whether Plaintiffs' claims completely are extinguished by resolution of EFC's motion in its favor.  Given this ambiguity, the Court declines to address the parties' arguments on these issues at this time, if at all.

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, the *Motion for Summary Judgment of Defendant Elyria Foundry Company* (Doc. 25) is **<u>GRANTED in part</u>** – *i.e.*, as to all claims, or portions of claims, asserted in Plaintiffs' Complaint that relate to pre-February 12, 1999 injuries.

Per the Court's analysis at Section V-B above, **<u>within ten (10) days of the date of this Order, Plaintiffs SHALL FILE</u>** a "Notice of Intent" indicating:

(1)     Whether the claims in their current Complaint assert contribution and/or indemnification claims against EFC relative to Litigation III settlement funds attributable to alleged post-February 12, 1999 injuries to the underlying tort plaintiffs, and

(2)     If so, whether they intend to pursue such claims.

If Plaintiffs provide a negative response to either inquiry, the Court will then dismiss this case in its entirety.  If Plaintiffs provide an affirmative response to both inquiries, they shall thereafter confer with Defendant and, <u>within ten (10) days of the filing of Plaintiffs' "Notice of Intent,"</u> the parties jointly shall propose three (3) dates in October 2006 for a Status Conference, at which the

27

Court will address how this case will proceed.[22]

**IT IS SO ORDERED.**

                                          **s/Kathleen M. O'Malley**

                                          **KATHLEEN McDONALD O'MALLEY**

                                          **UNITED STATES DISTRICT JUDGE**

**Dated: September 29, 2006**

---

[22]      Parties, through counsel, shall be available all day on the dates proposed.